COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-198-CV

 

 

ROSEMARY SMITH, BRADY
SMITH,                                     APPELLANTS

AND DONNA HUBBARD, 

INDIVIDUALLY AND AS PERSONAL 

REPRESENTATIVE OF THE HEIRS 

AND ESTATE OF DORMAN SMITH, 

DECEASED

 

                                                   V.

 

KELLY-MOORE PAINT
COMPANY, INC.                                      APPELLEE



 

 

                                              ------------

 

           FROM
THE 153RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








This is
an appeal from a summary judgment in favor of appellee Kelly-Moore Paint
Company, Inc. in this asbestos exposure products liability case.[1]
In a single issue, appellants Rosemary Smith, Brady Smith, and Donna Hubbard,
Individually and as Personal Representative of the Heirs and Estate of Dorman
Smith, Deceased (collectively, the Smiths), contend that the trial court erred
by granting a no-evidence summary judgment on the ground that the Smiths failed
to adduce sufficient evidence that Dorman had been exposed to chrysotile
asbestos in Kelly-Moore=s drywall joint compounds in a
dose sufficient to have been a substantial factor in causing his mesothelioma.

                                        Background
Facts

Dorman
began working in the construction business, specifically as a self-employed
drywaller finisher using joint compound, around 1955, and he performed the same
type of work through the mid 1980s. 
Doctors eventually diagnosed him with mesothelioma in early 2005.  As a result, the Smiths sued several
defendants, including Kelly-Moore, in Tarrant County, claiming that exposure to
the asbestos in those defendants= joint
compound products proximately caused Dorman=s
mesothelioma.  Dorman died after filing
suit, on December 9, 2005.








The case
was transferred to the 11th District Court, the Texas multidistrict litigation
pretrial court.  See Tex. Civ.
Prac. & Rem. Code Ann. ' 90.010(a)
(Vernon Supp. 2009); Tex. R. Jud. Admin. 13, reprinted in Tex. Gov=t Code
Ann. tit. 2, subtit. F app. (Vernon Supp. 2009).  Before trial, Kelly-Moore moved for both a
no-evidence and traditional summary judgment, contending that the Smiths had
presented no evidence that Dorman=s exposure
to any of Kelly-Moore=s chrysotile asbestos-containing
joint compound product caused his mesothelioma, under the test set forth in the
supreme court=s opinion in Borg-Warner
Corp. v. Flores, 232 S.W.3d 765 (Tex. 2007).[2]  The 11th District Court granted Kelly-Moore=s
no-evidence motion for summary judgment and transferred the remaining claims
back to the 153rd District Court in Tarrant County for trial; however, the
remaining claims against the other defendants were either settled or dismissed,
making the summary judgment final.  The
Smiths then appealed the summary judgment ruling in favor of Kelly-Moore.








                 No-Evidence
Summary Judgment Standard of Review

After an
adequate time for discovery, the party without the burden of proof may, without
presenting evidence, move for summary judgment on the ground that there is no
evidence to support an essential element of the nonmovant=s claim
or defense.  Tex. R. Civ. P.
166a(i).  The motion must specifically
state the elements for which there is no evidence.  Id.; Timpte Indus., Inc. v. Gish,
286 S.W.3d 306, 310 (Tex. 2009).  The
trial court must grant the motion unless the nonmovant produces summary
judgment evidence that raises a genuine issue of material fact.  See Tex. R. Civ. P. 166a(i) &
cmt.; Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008).








When
reviewing a no-evidence summary judgment, we examine the entire record in the
light most favorable to the nonmovant, indulging every reasonable inference and
resolving any doubts against the motion. 
Sudan v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006).  We review a no‑evidence summary
judgment for evidence that would enable reasonable and fair‑minded jurors
to differ in their conclusions.  Hamilton,
249 S.W.3d at 426 (citing City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005)).  We credit evidence
favorable to the nonmovant if reasonable jurors could, and we disregard
evidence contrary to the nonmovant unless reasonable jurors could not.  Timpte Indus., Inc., 286 S.W.3d at 310
(quoting Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex.
2006)).  If the nonmovant brings forward
more than a scintilla of probative evidence that raises a genuine issue of
material fact, then a no-evidence summary judgment is not proper.  Smith v. O=Donnell, 288
S.W.3d 417, 424 (Tex. 2009).

                            Issue on AppealBSpecific
Causation








The
ground raised in Kelly-Moore=s
no-evidence summary judgment motionCand
therefore the issue on appealCis
whether the Smiths produced sufficient evidence that Dorman was exposed to
chrysotile asbestos from Kelly-Moore=s joint
compound product at an exposure level or dose sufficient to have been a
substantial factor in his developing mesothelioma.  According to Kelly-Moore=s
no-evidence summary judgment motion, the Smiths did not produce any credible
evidence of (1) the amount of chrysotile asbestos from Kelly-Moore products to
which Dorman had been exposed, (2) epidemiological studies of similarly
situated persons showing that exposure to chrysotile asbestos in any amount
would double the risk of developing mesothelioma, or (3) a minimum threshold
exposure to asbestos above which an increased risk of developing mesothelioma
occurs.  Thus, Kelly-Moore contends that
the Smiths did not bring forward sufficient evidence of specific causation
under the test set forth by the Texas Supreme Court in Borg-Warner v. Flores
and applied in a similar fact scenario by the Houston Fourteenth Court of
Appeals in Georgia Pacific Corp. v. Stephens.  At oral argument, Kelly-Moore clarified that
it was relying on the distinction between chrysotile and other types of
asbestos;[3]
in other words, Kelly-Moore contends that although the Smiths may have brought
forward at least some sufficient evidence that exposure to amphibole or other
types of asbestos in the amount to which Dorman was exposed leads to an
increased risk of mesothelioma, they brought forward no evidence that exposure
to only chrysotile asbestos would amount to such an increased risk. Kelly-Moore
further contends that there is no evidence in the record of a minimum threshold
of chrysotile above which a person is at increased risk of developing
mesothelioma.

                           Specific
Causation in Asbestos Cases













In Borg-Warner
v. Flores, an automobile mechanic sued Borg-Warner and others claiming that
the dust generated by the grinding of asbestos-containing brake pads caused his
asbestosis.  232 S.W.3d at 766.  In reviewing the intermediate appellate court=s
determination that Flores had brought forward legally sufficient evidence of
causation at trial, the supreme court considered the appropriate causation
standard to be applied in cases in which a plaintiff Aclaim[s]
to be injured by an asbestos-containing product.@  Id. at 768B69.  The court held that in such cases, Awe must
determine whether the asbestos in the defendant=s
product was a substantial factor in bringing about the plaintiff=s
injuries.@ 
Id. at 770.  Because Aexposure
to asbestos, a known carcinogen, is never healthy but fortunately does not
always result in disease,@ a plaintiff must prove more
than exposure to an asbestos-containing product to prove that a particular
product was a substantial factor in bringing about his or her
injuries.  Id. at 770B71.  To prove Asubstantial
factor causation,@ a plaintiff must show both
frequent, regular, and proximate exposure to the product and reasonable
quantitative evidence that the exposure increased the risk of developing the
asbestos-related injury.  Id. at
769B72; Georgia
Pac. Corp. v. Stephens, 239 S.W.3d 304, 312 (Tex. App.CHouston
[1st Dist.] 2007, pet. denied); see also Lohrmann v. Pittsburgh Corning Corp.,
782 F.2d 1156, 1162 (4th Cir. 1986). 
Epidemiological studies showing at least a doubling of the risk of
disease upon exposure to asbestos have evidentiary significance only if Athe
injured person can show that >the
exposure or dose levels were comparable to or greater than those in the
studies.=@  Borg-Warner, 232 S.W.3d at 771 (quoting
Havner, 953 S.W.2d at 720B21).  According to Borg-Warner, then, to
prove specific causation in an asbestos exposure case, there must be some
evidence of an aggregate dose of exposure to the plaintiff that was a substantial
factor in causing the asbestos-related disease; in other words, there must be
some evidence that the dose to which the plaintiff was exposed exceeds a
minimum dose, or Athreshold,@ at
which an increased risk of developing the injury has been shown.  See Borg-Warner, 232 S.W.3d at 770B73; Stephens,
239 S.W.3d at 312, 321.








The
Fourteenth Court of Appeals applied the Borg-Warner Asubstantial
factor causation@ test in a suit brought by a
commercial painter who alleged that his mesothelioma was caused by exposure to
Georgia Pacific=s joint compound, which
contained only chrysotile asbestos.  Stephens,
239 S.W.3d at 306.  In Stephens, a
jury trial case, the plaintiff not only failed to provide legally sufficient
evidence of frequent, regular, and proximate exposure to Georgia Pacific=s
product, but he also failed to show a minimum dose at which an increased risk
of mesothelioma from chrysotile-only asbestos exposure would occur.  Id. at 321.  Stephens=s
experts testified instead that there is no minimum level of exposure to
chrysotile asbestos below which an increased risk of injury does not occur,
despite acknowledging that asbestos fibers are present in the ambient air we
breathe, especially in urban areas; in other words, the experts testified that any
exposure to chrysotile asbestos increases the risk of injury.  Id. at 314B15.  The court of appeals held that Borg-Warner
requires proof of more than Aany
exposure@ as a
minimum level to which the aggregate dose can be compared; otherwise, there is
no way to determine whether the product was a substantial factor in causing the
plaintiff=s mesothelioma as opposed to it
being attributable to asbestos exposure in the ambient air.  Id. at 321; see Temple-Inland
Forest Prods. Corp. v. Carter, 993 S.W.2d 88, 95 (Tex. 1999).

    Application of Substantial Factor
Causation Test in Mesothelioma Cases








The
Smiths first contend that the Asubstantial
factor causation@ test announced by the supreme
court in Borg-Warner and applied by the Fourteenth Court of Appeals in Stephens
is not applicable in every asbestos exposure case.  Specifically,
they contend that ABorg-Warner . . .
did not create an absolute requirement in every asbestos case that [a]
plaintiff produce quantitative evidence of >dose= to each
defendant=s product, as a condition
precedent to a finding of liability.@  They point out the difference between
mesothelioma and asbestosis, which is the disease at issue in Borg-Warner.
Asbestosis is a dose-related disease that is typically the result of either Along-term,
high-level exposure to asbestos@ or Arelatively
brief but extremely heavy exposure.@  Borg-Warner, 232 S.W.3d at 771.  It Aappears
to be dose-related, >so that the more one is exposed,
the more likely the disease is to occur, and the higher the exposure the more
severe the disease is likely to be.=@  Id. (quoting 3 David L. Faigman et
al., Modern Scientific Evidence:  The Law
and Science of Expert Testimony ' 28.22,
at 447 (2007)).  In addition, there are
over 100 causes of asbestosis.  Id.
at 766.  On the other hand, the Smiths
presented evidence that mesothelioma is a signature disease, meaning that it
does not typically occur in the absence of asbestos exposure.  See C.R. at 1706 (citing P. Boffetta,
Health Effects of Asbestos Exposure in Humans: 
a Quantitative Assessment, Med Lav 89(6):471B80
(1998) (ABecause
of the rarity of the disease and the specificity of the causal association, all
cases occurring among asbestos exposed workers are attributed to this exposure.@)).  In
addition, it is generally accepted that a person can develop mesothelioma from
only low levels of asbestos exposure.  Borg-Warner,
232 S.W.3d at 771 (citing 3 Faigman, supra).  The Smiths contend that the nature of
mesothelioma thus distinguishes this case from Borg-Warner so that the
requirements of showing a total and threshold dose are not necessary.













Although
it appears from both scientific literature and case law that the causative
connection between mesothelioma and asbestos exposure is much more solidly
linked than in cases of asbestosis and asbestos exposure, such that asbestos
exposure in any amount other than general background levels would appear to be
causative of mesothelioma,[4]
we cannot read Borg-Warner, and the test announced therein, so narrowly
as to apply only to asbestosis or asbestos-exposure cases other than
mesothelioma.  The supreme court quite
clearly states that the test it announces is the standard to be applied in
cases in which a plaintiff Aclaim[s]
to be injured by an asbestos-containing product.@ Id.
at 768B69.  The court did not distinguish among different
diseases caused by asbestos exposure, nor among different types of
asbestos.  Thus, we conclude and holdCas we
must, being bound by supreme court precedentCthat a
plaintiff in a mesothelioma suit that he or she claims is caused by an
asbestos-containing product must prove the elements set forth in Borg-Warner=s Asubstantial
factor causation test@:  specifically, an aggregate dose of exposure
from the defendant=s product and a minimum
threshold dose above which an increased risk of developing mesothelioma
occurs.  See Stephens, 239 S.W.3d
at 312, 320B21; see also Lubbock County,
Tex. v. Trammel=s Lubbock Bail Bonds, 80
S.W.3d 580, 585 (Tex. 2002) (noting that once the supreme court announces a
proposition of law, that proposition is binding precedent and may not be
modified or abrogated by a court of appeals).

Thus, in
this case, we must determine whether there is any evidence that would raise a
genuine fact issue as to (1) the total dose of chrysotile asbestos from
Kelly-Moore products to which Dorman was exposed and (2) whether that dose
exceeds a minimum threshold dose above which an increased risk of developing
mesothelioma occurs.

              Dorman=s Total
Exposure to Kelly-Moore Joint Compound

Lay Witness Testimony








The
Smiths attached excerpts from Dorman=s
deposition to their summary judgment response, in which he testified that as a
drywall finisher, he Aalways@ worked
with joint compounds.  He personally
mixed, sanded, and swept the dust generated by the joint compound during mixing
and sanding.  He also breathed in a
significant amount of that dust during those activities.  During the mixing process, the dust would
come right back up in his face and he would breathe it.[5]  Dorman said he Alooked
like Frosty the Snowman after finishing a job.@

Dorman
testified that he did thousands of drywall jobs over his career. Over that
career, he used all the brands of joint compound Aabout
the same.@[6]
According to Dorman, when he used Kelly-Moore product, he breathed in the dust
the same as he would when he did jobs using other products.  Dorman did not know when he first started
using Kelly-Moore joint compound, but he stopped using it in the mid to late
1970s, after Kelly-Moore had removed asbestos from its products.

Dorman=s son
Brady Smith worked with him from the late 1960s to the 1970s.  He testified in his deposition that when he
worked with his father, they only used Kelly-Moore ready mixed product (so the
only dust would be generated from sanding and sweeping).  According to Brady, they used Kelly-Moore
product on a Apretty regular basis,@ but the
amount could vary, and they used it a little less than others because of the
price.








According
to Brady, he and his father spent the majority of their time working in
residential tract homes and apartment buildings; they spent about 10 percent of
their work time on commercial projects. 
Brady estimated they spent 10 percent of the work week sandingCand
fifteen percent mixing and sweepingCjoint
compound.  An average house they worked
in would be a three-bedroom, two-bath with about 1400 to 1800 square feet; the
average size of the bedrooms was about 10 x 10, the average size of the
bathrooms 6 x 6, and the average size of the dining and living areas about 15 x
12.  The apartments they worked in were
about 800 to 900 square feet with 10 x 10 bedrooms and 20 x 20
kitchen/living/dining combination areas.

Expert Testimony

Dr.
Ronald Dodson performed a tissue burden analysis on Dorman=s lung
tissue after he died.  The Smiths
provided deposition excerpts in which Dr. Dodson testified that he found
silica, talc, glass, and chrysotile fibers in Dorman=s lung
tissue.  He could not tell when any of
the chrysotile fibers were deposited into the lung tissue.  All of the chrysotile fibers he observed were
longer than what he would expect to find in the lungs of the general
population, i.e., those who had only had background exposure, and not
occupational exposure, to asbestos.








The
Smiths also attached deposition excerpts from a defendant=s
expert, Patricia Hall, a certified industrial hygienist, in which she estimated
that as a Aworst-case estimate,@ Dorman
had a total exposure to asbestos-containing joint compounds of six years,[7]
working with joint compound at least fifty percent of the day, amounting to a
total exposure of 9-15 fibers/cc year over the course of his career.  However, Hall disputed that this amount of
exposure correlates to any increased risk of mesothelioma if all of that
exposure was to chrysotile asbestos only.








The
Smiths further presented an affidavit and deposition testimony from Dr. William
Longo, who performed fiber release studies measuring the effects of mixing,
sanding, and sweeping up the dust from various joint compounds in a laboratory
setting.  The dry powder Kelly-Moore
product he tested contained 8% chrysotile.[8]  Dr. Longo measured Kelly-Moore joint compound
as emitting an average of 1.2 fibers/cc for mixing, 1.6 fibers/cc for sanding,
and 1.3 fibers/cc for sweeping.  Thus, in
a job in which Dorman mixed, sanded, and swept Kelly-Moore joint compound, he
would have been exposed to an average of 4.1 fibers/cc, which exceeds the
1976 OSHA recommended limit of 2 fibers/cc (this permissible exposure level
(PEL) was further reduced by OSHA in the 1990s to .1 fiber/cc for all asbestos
fiber types).  Dr. Longo also opined that
a real world exposure would have been higher because a person working on a
typical dry wall finishing project would use around 25 bags of mix and sand an
entire room as opposed to five linear feet sanded in Dr. Longo=s tests.

Conclusion








Considering
this evidence in the light most favorable to the Smiths, there is at least a
fact question as to how often Dorman used (and was therefore exposed to)
Kelly-Moore joint compound as opposed to other companies= joint compounds;
because he testified that he used it Aabout
the same@ as any
other, it is possible to roughly estimate his total use of Kelly-Moore product
as a fraction of the total estimated use divided by the number of products he
allegedly used.  Based on these facts,
the Smiths at least raised a genuine issue of material fact as to the aggregate
dose of Kelly-Moore asbestos-containing joint compound (and total asbestos
fibers) to which Dorman was exposed.  Accordingly, we conclude and
hold that the Smiths raised a genuine issue of material fact as to the Lohrmann
factors (frequency, regularity, and proximity). 
We must next determine whether they raised a genuine issue of material
fact as to whether the total dose of chrysotile asbestos to which Dorman was
exposed exceeds a minimum dose above which mesothelioma does not occur.  See Borg-Warner, 232 S.W.3d at 770B73; Stephens,
239 S.W.3d at 312, 321.

      No Evidence of Minimum Dose of
Chrysotile at Which Increased Risk

                            of Developing
Mesothelioma Occurs

 

Dr.
Arnold Brody, a research scientist in lung biology and lung pathology, averred
in an affidavit that A[a]ll of the asbestos varieties
have been shown to cause genetic errors[,] and fibers less than five microns
can bind DNA and thus contribute to the development of genetic damage. . .
.  Exposure to asbestos fibers of all
types and lengths should be considered in assessing a person=s risk
of developing mesothelioma.@  However, he did not opine as to how much
asbestos Dorman had been exposed to or what a minimum exposure at which a
person=s risk
of mesothelioma increases might be. 
Thus, his opinion only goes to general causation.  See Havner, 953 S.W.2d at 714; Stephens,
239 S.W.3d at 308.








 Another of the Smiths=
experts, Dr. John Maddox, who is board certified in anatomical and clinical
pathology and hematology, concluded that Dorman breathed substantial amounts of
dust from the products of each of the defendants and that these exposures were
a substantial contributing factor in the development of his mesothelioma.  According to Dr. Maddox, A[b]ecause
asbestos dust is so strongly associated with mesothelioma, proof of significant
exposure to asbestos dust is proof of specific causation.@  Dr. Maddox opined that it is generally
accepted in the scientific community that there is no minimum level of exposure
to asbestos Aabove background levels@ below
which adverse effects do not occur.  In
fact, he stated that A[a]ttempts to define any such a
minimum level of exposure above background levels of asbestos have been
dismissed as >logical nonsense.=@[9]  He estimated a mean background level at .0003
to .0004 fibers/cc, which is well below Dorman=s
estimated total exposure.  See, supra,
Conclusion.








According
to Dr. Maddox, A[t]he overwhelming world
scientific consensus is that dust from all three commercial types of asbestos -
amosite, crocidolite and chrysotile - are all capable of causing diffuse
mesothelioma.@ 
However, the literature upon which Dr. Maddox relied is inconclusive
regarding the effect of exposure to only chrysotile fibers; while studies have
shown increased risks of mesothelioma in chrysotile miners and millers and in
people living in chrysotile mining areas, researchers have hypothesized that
this may be because the chrysotile was mixed with other types of fibers.[10]  Additionally, the studies showing an
increased incidence of mesothelioma in these populations did not attempt to
extrapolate any minimum dose of chrysotile to which these populations were
exposed.  Most of the studies agree that
amphibole fibers are considered more potent than chrysotile fibers in terms of
causing mesothelioma.[11]  Moreover, at least one study notes that
mesothelioma is rare, even among populations exposed only to chrysotile.[12]








Dr.
Maddox cited OSHA regulations for the proposition that chrysotile is capable of
causing mesothelioma.  Current OSHA PELs
for all fiber types are .1 fiber/cc; Dorman=s
estimated exposure clearly exceeded those levels.  However, even the comments to the OSHA
guidelines acknowledge that chrysotile studies are inconclusive as to what
level of chrysotile creates an elevated risk of mesothelioma but nevertheless
conclude that the PEL for chrysotile should be the same as for all other fiber
types because asbestos is so dangerous and clearly has adverse effects.[13]








To support
his opinion that Dorman=s exposure to chrysotile was a
substantial factor in causing his mesothelioma, Dr. Maddox points specifically
to a study that found a proportionate mortality ratio of 2.03 for mesothelioma
deaths among plasterers in England. 
According to Dr. Maddox, the plasterers were Aindividuals
who used joint compounds that contained chrysotile asbestos.@  But the copy of the study attached to his
affidavit does not mention the nature of the work done by the plasterers, nor
does it differentiate among asbestos fibers. 
Because there is insufficient information to compare the exposure or
dose levels of the plasterers to Dorman=s, this
study cannot be relied on as statistically significant in determining specific
causation of Dorman=s mesothelioma.  See Borg-Warner, 232 S.W.3d at 771B72.

The
Smiths rely on several specific studies in their reply brief, arguing that they
provide at least a scintilla of evidence as to the minimum threshold value
required by Borg-Warner.  The
Selikoff studies measured the potential amount of fibers to which a worker
using joint compound in the same manner as Dorman would have been exposed, but
those studies did not Aattempt to correlate the
exposures to any incidence of mesothelioma or asbestos-related disease among
the study subjects.@ 
See Stephens, 239 S.W.3d at 317. 
And a study by Iwatsubo showing a four-fold increase of mesothelioma at
an exposure level of .5 fibers/cc, and a study by Rodelsperger showing a 7.9
odds ratio of an increased risk of mesothelioma at cumulative exposures between
0.0 and .15 fibers/cc year, both fail to provide the minimum dose evidence
required under Borg-Warner: 
neither study differentiates among fiber types.








Dr.
Maddox further relies on the results of Amolecular
biological studies, animal experiments, epidemiological studies, case reports,
and asbestos tissue burden studies.@  Specifically, he notes that in one study, A151 human
malignant diffuse mesothelioma cases were identified and characterized by
high-resolution analytical electron microscopy. 
Chrysotile alone, with no amphiboles, was found in the lungs in over 23%
of the cases.  In those cases where the
mesothelioma only was examined, 77% contained only chrysotile.@
Although this example clearly shows that chrysotile is capable of causing
mesothelioma, as evidenced by its presence in the decedents= lung
tissue, there is no indication in the literature as to the approximate dose of
chrysotile that the studied decedents were exposed to.  Thus, this study cannot be relied on to show
specific causation as to Dorman.  See
Borg-Warner, 232 S.W.3d at 771B72.  Moreover, there is no evidence of any attempt
to correlate the dosages in the animal studies to an approximate exposure level
in humans, and none of the epidemiological studies show a minimum threshold of
chrysotile exposure from which to measure whether Dorman had an elevated risk
of mesothelioma.








It
appears well-established in the scientific literature presented by the Smiths
that there is a threshold dose above which a person has an elevated risk of
developing asbestosis from chrysotile-only exposure.  But that same evidence does not support a
minimum threshold dose for chrysotile only exposure that would increase one=s risk
of developing mesothelioma.  Some
of these same studies upon which Dr. Maddox relies are the ones examined and
found lacking in Stephens.  See
239 S.W.3d at 316.  Thus, even though the
Smiths raised a fact issue as to the Lohrmann factors (whereas evidence
as to those factors was lacking in Stephens), the Smiths=
evidence ultimately suffers the same defect as the plaintiff=s in Stephens:
A[w]ithout
. . . scientific evidence of the minimum exposure level leading to an
increased risk of development of mesothelioma@ from
exposure to chrysotile-only asbestos, such as that contained in Kelly-Moore=s joint
compound, Dr. Maddox=s opinion lacks Athe
factual and scientific foundation required by Borg-Warner@ and,
thus, is insufficient to raise a fact issue as to specific causation.  Id. at 321.  We therefore must overrule the Smiths= sole
issue.

                                             Conclusion

Having
overruled the Smiths= sole issue, we affirm the trial
court=s
judgment.

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, MCCOY, and
MEIER, JJ.

 

DELIVERED:  February 25, 2010











[1]This court dismissed the
Smiths= appeal against Bondex
International, Inc. and RPM, Inc. in accordance with a joint motion by the
Smiths, Bondex, and RPM.  No.
02-08-00198-CV, 2009 WL 2356855, at *1 (Tex. App.CFort Worth July 30, 2009,
no pet.).





[2]Kelly-Moore challenged
the Smiths= evidence as to specific
causation only:  whether Kelly-Moore=s asbestos-containing
product caused Dorman=s mesothelioma.  They did not challenge the evidence as to
general causation, i.e., that Kelly-Moore=s asbestos-containing joint compound is capable
of causing mesothelioma in the general population.  See Merrell Dow Pharm., Inc. v. Havner,
953 S.W.2d 706, 714 (Tex. 1997), cert. denied, 523 U.S. 1119 (1998); Georgia
Pac. Corp. v. Stephens, 239 S.W.3d 304, 308 (Tex. App.CHouston [1st Dist.] 2007,
pet. denied).





[3]There are six different
types of asbestos; chrysotile is the most abundant type of asbestos fiber and
is a serpentine fiber consisting of Apliable curly fibrils which resemble scrolled
tubes.@  Borg-Warner, 232 S.W.3d at 766 n.4
(citing Lee S. Siegel, Note, As the Asbestos Crumbles:  A Look at New Evidentiary Issues in Asbestos
Related Property Damage Litigation, 20 Hofstra L. Rev. 1139, 1149
(1992)).  The remaining five types are
generally referred to as amphiboles.





[4]Other jurisdictions have
recognized the need for taking into account the nature of the plaintiff=s asbestos related
disease in determining causation.  See,
e.g., Purcell v. Asbestos Corp., 959 P.2d 89, 94 (Or. Ct. App. 1998)
(declining to adopt the Lohrmann test but noting that Aeven the jurisdictions
that follow the frequency, regularity, and proximity test apply it less rigidly
when dealing with mesothelioma, because it can be caused by very minor
exposures@), opinion modified on
nondispositive grounds, 963 P.2d 729 (1998); Wehmeir v. UNR Indus., Inc.,
572 N.E.2d 320, 337 (Ill. App. Ct. 1991) (stating that in applying the Lohrmann
factors, each case will stand on its facts and pointing out the difference in
exposure levels needed to cause mesothelioma and asbestosis).





[5]Dorman used both quick
and non quick set joint compound (one creates dust when mixing, and the other
is premixed so the only dust is from sanding and sweeping).  But in the beginning of his career, he Aalways mixed it.@





[6]When asked which product
he used the most, Dorman answered, AAll of them,@ and A[w]hatever was closest for me to get, that=s what I bought.@





[7]Hall=s opinion was in the
context of determining what Dorman=s exposure to Sherwin Williams=s products might have
been.





[8]In answering the Smiths= interrogatories,
Kelly-Moore provided a chart showing that its dry powder joint compounds
contained between 0 and 8.3 percent chrysotile asbestos.  But Dr. Longo points out in his affidavit
that he never tested a Kelly-Moore joint compound that contained zero or Aa wide range@ of chrysotile.





[9]Dr. Maddox opined that Awhile there is no known
safe level of exposure to asbestos that will protect against mesothelioma, it
is generally accepted that there is such a threshold for asbestosis.@





[10]And one study noted, AIn some studies . . .
workers exposed to only chrysotile asbestos have shown no increased risk of
lung cancer . . . .  As a consequence,
researchers have implicated not chrysotile per se but a contaminant amphibole
fiber as the specific cause of lung cancer . . . and malignant mesothelioma.@





[11]One study found the risk
of mesothelioma to be 1:100:500 for chrysotile, amosite, and crocidolite,
respectively.  Patricia Hall stated in
her deposition testimony that her Aunderstanding of the literature is that
chrysotile asbestos is not associated with an increased risk of mesothelioma
unless the dose, the cumulative dose, is so massive as to be able to cause
asbestosis.  So we=re looking at high
numbers. . . .  There are . . . some
numbers that are presented in the literature that the . . . dose of chrysotile
to produce asbestosis is in the range of 100 to 200 fiber years.  So it takes a sufficient dose in order to be
able to cause asbestosis with just a chrysotile exposure.  It takes a significant dose.@  Dr. Dodson acknowledged in his deposition
that some scientists believe that amphiboles and chrysotile are equally potent,
but others believe amphiboles are more potent than chrysotile.  He agreed that it would be reasonable to say
that most scientists and researchers would opine and do opine in the
peer-reviewed literature that amphiboles are more potent than chrysotile.





[12]Another study indicates
that environmental exposure to abestos is also associated with mesothelioma.





[13]The regulations note that
Aalthough there is some
evidence linking chrysotile to a lower mesothelioma rate than some amphibole
fiber types, OSHA believes that there is insufficient evidence to show that
chrysotile does not present a significant mesothelioma  risk to exposed employees.@  29 C.F.R. Part 1910, Occupational Exposure to
Asbestos:  Final Rule (Aug. 10, 1994).
Exposure above the OSHA levels cannot be used as evidence of negligence per se,
however.  See McClure v. Denham,
162 S.W.3d 346, 353 (Tex. App.CFort Worth 2005, no pet.).